# Exhibit 1

~~CUI~~

# Executive Summary

On 12 July 2020, a fire set USS BONHOMME RICHARD (LHD-6) ablaze for more than four days, and left the ship damaged beyond economical repair. Although the fire was started by an act of arson, the ship was lost due to an inability to extinguish the fire. In the 19 months executing the ship's maintenance availability, repeated failures allowed for the accumulation of significant risk and an inadequately prepared crew, which led to an ineffective fire response. There were four key focus areas to this final outcome:

- Material Condition. Throughout the maintenance period, the material condition of the ship was significantly degraded, to include heat detection capability, communications equipment, shipboard firefighting systems, miscellaneous gear clutter, and combustible material accumulation. To illustrate the extent of degradation, on the morning of the fire, 87% of the ship's fire stations remained in inactive equipment maintenance status.

- Training and Readiness. The training and readiness of Ship's Force was marked by a pattern of failed drills, minimal crew participation, an absence of basic knowledge on firefighting in an industrial environment, and unfamiliarity on how to integrate supporting civilian firefighters. To illustrate this point, the crew had failed to meet the time standard for applying firefighting agent on the seat of the fire on 14 consecutive occasions leading up to 12 July 2020.

- Shore Establishment Support. The integration and support expected by the shore establishment did not adhere to required standards. Southwest Regional Maintenance Center (SWRMC) did not meet their requirements associated with fire safety and, in doing so, failed to communicate risk to leadership while facilitating unmitigated deviations from technical directives. Naval Base San Diego (NBSD) failed to ensure its civilian firefighters were familiar with Navy vessels on the installation, verify they were trained to respond to a shipboard fire, or effectively practice how to support Ship's Force and simultaneously integrate responding mutual aid assets.

- Oversight. Ineffective oversight by the cognizant Commanders across various organizations permitted their subordinates to take unmitigated risk in fire preparedness. A significant source of this problem was an absence of codification of the roles and responsibilities expected by each organization in their oversight execution.

Common to all four focus areas was a lack of familiarity with key policies and requirements along with procedural non-compliance at all levels of command from the unit level to programmatic, policy, and resourcing decisions. An example of how these focus areas combined to result in unacceptable levels of risk is the status of the ship's Aqueous Film Forming Foam sprinkling system. At no point in the firefighting effort was it used – in part because maintenance was not properly performed to keep it ready and in part because the crew lacked familiarity with capability and availability.

8

~~CUI~~

CUI

On Sunday, 12 July 2020, at approximately 0800 and shortly after duty section turnover, a fire started in the Lower Vehicle Stowage Area (Lower V) of BONHOMME RICHARD.  The ship was in the midst of a two-year availability and was particularly vulnerable to fire: having systems tagged out for maintenance; scaffolding, temporary services, and other contractor equipment hung throughout; a significant amount of ship's gear, equipment, flammables and combustible material recently loaded onto the ship and packed into various spaces; and, more than three-quarters of the ship's firefighting equipment was in an unknown status.

BONHOMME RICHARD's crew of more than 1,000 personnel, divided into a varied array of duty sections by department and functional areas, had approximately 138 Sailors present that morning – 115 of whom were on duty.  The Command Duty Officer (CDO) was a second tour Surface Warfare Officer (SWO) division officer standing his first duty day as CDO and oversaw BONHOMME RICHARD's initial response to the fire.  At least 10 minutes elapsed after the initial detection of smoke before the casualty was called away.  These precious early minutes were lost for various reasons — the duty section primarily used personal cell phones to communicate because they lacked radios; the Officer of the Deck (OOD) directed further investigation of the smoke before taking action; when the OOD was convinced of a casualty, he directed Damage Control (DC) Central to call it away; the 1 Main Circuit (MC) did not work in many areas of the ship to include DC Central; and there was a lack of urgency.  When initial responders from Ship's Force descended into Lower V, no one shared the same understanding of what firefighting capability was online, contributing to their failure to apply agent to the fire or set fire boundaries, which enabled smoke and heat to intensify.

As a small number of BONHOMME RICHARD Sailors executed their initial actions, crews moored across NBSD began organizing and deploying Rescue and Assistance (R&A) teams.  The R&A teams from other ships that arrived early on that morning to provide support were never employed by BONHOMME RICHARD.  Aboard BONHOMME RICHARD, the ship's duty section mustered in the Hangar and deployed two attack teams to locate a usable fire hose in the Upper Vehicle Stowage Area (Upper V).  Because the nearest shipboard fire stations had cut or missing hoses that were not corrected through routine maintenance checks, these teams were unsuccessful locating a serviceable fire station and hose and they did not adapt their strategy in light of these conditions.

Shortly after 0830, NBSD Federal Fire Department (FEDFIRE) crews arrived, having been directed to respond by a Region Dispatch Center (RDC) dispatcher.  FEDFIRE firefighters were met by the CDO, who was overseeing a small and unorganized group of BONHOMME RICHARD Sailors.  After checking in with the CDO, and without being provided actionable information or direction, FEDFIRE began to employ their own hoses, pulling them nearly 30 feet vertically up the port Aircraft Elevator (ACE) into the Hangar.  Although the sideport door located further down the pier would have provided immediate access to Upper V and was the closest entrance to the fire, FEDFIRE was not given direction to enter from that location.  The lack of direction and leadership from Ship's Force over firefighting efforts led FEDFIRE to operate as an independent unit.

FEDFIRE ran their hoses a significant distance along the Hangar, down the ramp to Upper V, through Upper V, and down the ramp to Lower V.  With no installed firemain system on the

CUI

pier, FEDFIRE connected their hoses to a potable water riser, which was supplying water to USS FITZGERALD (DDG-62) directly across from BONHOMME RICHARD. Through this prolonged approach, a single FEDFIRE hose team with one BONHOMME RICHARD Sailor transited towards the fire but only partially accessed Lower V. While this was the first attempt to deploy agent on the fire nearly an hour after ignition, the hose team only opened their hose nozzle temporarily for cooling purposes. Within just a few minutes, the team backed out after one of the firefighters received a "low air" alarm on his Self-Contained Breathing Apparatus (SCBA) and no relief team replaced them.

At 0905, the BONHOMME RICHARD CO arrived onboard NBSD and proceeded to the pier. Around the same time, as FEDFIRE organized its effort from the port ACE to attack the fire from the Hangar, additional firefighters arrived from various municipal fire departments. These municipal departments were organized under San Diego Fire Department (SDFD), but a lack of compatible radios inhibited integration efforts between SDFD and FEDFIRE. Throughout the first three hours and with rare exception, there were no attempts by the CO, CDO, or other BONHOMME RICHARD leaders to integrate civilian firefighters with Ship's Force. Moreover, many of the personnel on scene at this time perceived FEDFIRE had assumed control of firefighting. Around 0915 and due to the significant growth in smoke, the CDO, with concurrence from the CO, ordered the evacuation of BONHOMME RICHARD personnel without SCBAs by informing them individually in the Hangar because he did not have adequate communications gear. With a significant number of uniform personnel egressing the ship following this order, by 0930, all BONHOMME RICHARD personnel began to evacuate.

Despite undergoing an availability, BONHOMME RICHARD was equipped with extensive shipboard firefighting systems, which included firemain and Aqueous Film Forming Foam (AFFF) sprinkling systems and hoses. At no point in the firefighting effort were any of them used, in part because they were degraded, maintenance was not properly performed to keep them ready, and the crew lacked familiarity with their capability and availability. Three months before the fire, BONHOMME RICHARD was required by policy to restore shipboard firefighting systems when it onloaded more than 900,000 gallons of fuel. For the AFFF sprinkling systems, Ship's Force determined only a limited portion would be brought online. Notwithstanding the roles and responsibilities of the ship's Executive Officer (XO), Chief Engineer (CHENG), and Damage Control Assistant (DCA), the systems that were brought online had numerous undocumented system discrepancies. By 0944 on the day of the fire, aft shore power to BONHOMME RICHARD was secured, likely due to the direction of the CDO who believed that the fire was electrical in origin. This action rendered the ship's firemain and AFFF unusable, as the ship lacked any backup power source. From this point on, all firefighting efforts relied on external water sources, which were further hampered by the lack of firemain on NBSD piers.

Throughout the entire morning, BONHOMME RICHARD did not lead firefighting efforts and failed to coordinate or attempt to integrate attack teams from SDFD or FEDFIRE with Ship's Force to attack the fire. At approximately 0935, SDFD firefighters initiated an effort to enter the ship via the sideport door, the closest access point to attack the seat of the fire. Without any Ship's Force escort or assistance, and without Damage Control plates being made available to them, SDFD accessed the ship and attempted to locate the seat of the fire. They encountered

CUI

ship and contractor equipment substantially narrowing their available access path to the fire.  By this point, combustible materials stored in Upper V had ignited from heat radiating through the deck below, creating additional fires.  SDFD partially descended the ramp to Lower V, but the heat, lack of visibility, and unfamiliarity with the ship's layout led them to back out without engaging the fire.  SDFD and its municipal partners eventually engaged ancillary fires in Upper V for approximately 45 minutes.  Around this time, FEDFIRE terminated its attack from the Hangar and staged on the pier where SDFD entered the ship to support them.

Shortly after 1030, the SDFD and FEDFIRE Incident Commanders (IC) noted deteriorating fire conditions and ordered the withdrawal of all firefighters from the ship — a decision likely preventing any loss of life or serious injuries to numerous personnel.  At 1050, less than five minutes after the last firefighter exited BONHOMME RICHARD, a major explosion rocked the ship, blowing debris across the pier and knocking down firefighters and Sailors.  This explosion occurred after more than two hours of efforts where none of the ship's installed firefighting systems were employed and no effective action was taken by any organization involved to limit the spread of the smoke and fires.  After the explosion, all personnel completely evacuated the pier.  Without personnel onboard, available installed systems, or electrical power, the fires on BONHOMME RICHARD were unimpeded.  Subsequent attempts to regain a foothold aboard relied on ad hoc strategies, delivering too little firefighting agent to combat the pace of the fire's spread.  Throughout the first day of efforts, agent was never applied to the seat of the fire, and the opportunity to do so was lost once the fire spread beyond the perimeter of Lower V and across the entire ship.

The fire expanded unabated and burned for the next four days, despite the efforts of hundreds of Sailors, FEDFIRE and contract firefighter support.  Earlier failures to either extinguish or contain the fire transformed the ship into an environment where some compartments reached temperatures above 1,200 degrees Fahrenheit.  The interior of the ship's superstructure, made of aluminum, melted completely in such heat, converting into molten metal that flowed into the spaces below.  It was into this environment Sailors and firefighters made repeated entries in an attempt to save BONHOMME RICHARD.  Though their efforts were unsuccessful and occurred beyond the point where the ship could have been saved, the courage displayed in subsequent firefighting efforts warrant acknowledgment.

The overall command and control for the fire response was initially chaotic, but it improved over time through ad hoc decisions and assignments.  Although the CO, XO, CMC, CHENG, and DCA were all present on the pier prior to the explosion, they failed to establish command and control of the situation and did not lead action to integrate fire response efforts.  Instead, Commander, Expeditionary Strike Group THREE (ESG-3), the ship's operational Commander who has no assigned role or responsibility in response to a shipboard fire during a maintenance availability, stepped into a command and control vacuum to align the various ship, installation, and external organizations by employing a make-shift emergency response organizational structure.  This rapidly-formed command structure enabled coordinated action, and by the fifth day, the fire was declared out.  The fire was extinguished due to five days of firefighting efforts coupled with the limited amount of combustibles remaining onboard that had not previously burned.  The fire left the ship damaged beyond economical repair, leading to the decision to decommission BONHOMME RICHARD.

11

CUI

CUI

Preceding the day of the fire, the investigation evaluated the execution of the BONHOMME RICHARD 19 month maintenance availability. Consistent with any extended maintenance period, the risk of fire is significantly higher as compared to operating at sea due to hazards associated with industrial work onboard ships. The ship's CO and crew are primarily responsible for the management of this risk but the complexity of an availability requires support from multiple organizations.

As the Navy entity for overseeing the contractor's maintenance activities on BONHOMME RICHARD, the Southwest Regional Maintenance Center (SWRMC) was the single point of contact responsible for the planning, execution, and close out maintenance actions. While moored at Pier 2, NBSD was responsible for support to the ship and associated maintenance activities, to include the availability of shore based firefighting capabilities. Additionally, higher echelon Commanders were responsible to safeguard procedural compliance and enable mission success through effective oversight.

What should have happened during the course of the BONHOMME RICHARD availability was the maintenance community and shore establishment, coupled with effective oversight, would support the ship in navigating its milestones. Instead, there were multiple execution failures throughout the maintenance period, which are shared by Ship's Force and the supporting organizations.

Equally important is the development and efficacy of the underlying policies and procedures. The governing framework on how to successfully execute maintenance availabilities is principally derived from lessons learned from previous incidents and events. Most notably, the Navy maintenance community undertook a broad array of programmatic changes in the wake of the fire aboard USS MIAMI (SSN-755) that occurred on 23 May 2012. In response to this fire, Commander, U.S. Fleet Forces Command (USFF) convened a Fire Review Panel to determine how MIAMI could be lost in a shipyard environment despite readily available fire prevention programs and resources. The critical takeaway from the MIAMI investigation, as stated in the USFF endorsement was that "accept[ing] a reduced margin to fire safety when a ship enters an industrial environment" was a key driver to the policies and procedures that developed to prevent a similar outcome. Foremost among these changes was the development of the NAVSEA Technical Publication, Industrial Ship Safety Manual for Fire Prevention and Response, S0570-AC-CCM-010/8010 (hereafter "8010 Manual"). For the BONHOMME RICHARD availability, however, many of the requirements developed and codified in the 8010 Manual were not properly executed – to include the functions of the Fire Safety Council as a means to manage the accumulation of risk and the Chapter 12 and 13 drills that were designed to enable a coordinated response to a shipboard fire during a maintenance period.

In the last 5 years, policy changes and corrective actions to address fire safety were inconsistently implemented or failed to be implemented across the Navy maintenance organization. While not the focus of this investigation, training, implementation, and compliance with the 8010 Manual in private shipyards was not representative of maintenance on nuclear vessels being executed in the public yards. Additionally, there was a lack of procedural compliance and effective oversight within the Naval Sea Systems Command (NAVSEA), Navy Installations Command, and Naval Surface Force Pacific Fleet. This placed the non-nuclear

CUI

Surface Fleet on a trajectory of an unacceptable fire prevention and response posture with a high level of accumulated risk before the fire started on 12 July 2020. Once the fire started, the response effort was placed in the hands of inadequately trained and drilled personnel from a disparate set of uncoordinated organizations that had not fully exercised together and were unfamiliar with basic issues to include the roles and responsibilities of the various responding entities.

Our business requires us to operate in a pressurized environment, with aggressive timelines, performing to plans and an expectation to always accomplish the mission. In the case of BONHOMME RICHARD, the leaders most directly associated to this final outcome framed their decisions around a false choice between meeting timelines versus adhering to safety and standards. Exacerbating this, leaders failed to communicate these choices up the chain of command. The course corrections and changes identified in this report are designed to prevent this outcome in the future. Finally, Commanders at all levels are entrusted with extraordinary responsibility with full regard for its consequences – as command is the foundation upon which our Navy rests.